IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES *ex rel.* BRUCE C. HAYDEN,
    *Relator,*

    v.

ROBERT G. GRAW, JR., M.D., *et al.,*

    *Defendants*.

Civil No. ELH-14-2379

**MEMORANDUM OPINION**

In this *qui tam*[1] case, Relator/plaintiff Bruce Hayden filed suit on behalf of the United States, as well as the State of Maryland, against numerous defendants, alleging that they engaged in a scheme to inflate bills for patient visits at defendants' urgent care and pediatric medical facilities in order to recover higher reimbursements from Medicare and Medicaid. ECF 1; *see* 42 U.S.C. § 1395y(a)(1)(A); *id.* § 1320c-5(a)(1); *id.* § 1320-a-7b(a)(1); *id.* § 1320-a-7b(a)(3). The defendants are Robert G. Graw, Jr., M.D.; Stanford Joseph Coleman, Jr., M.D., M.B.A.; Marc E. Weber, M.D.; Jon W. Gonella, P.A., a physician's assistant; Kimberly Bresnahan, Chief Operating Officer ("COO") of certain defendants; Harcart Health Holdings, LLC ("HHH" or "Harcart"); Family Urgent Care, LLC ("FUC" or "Family Urgent Care"); Cedar Health Ventures, LLC ("CHV" or "Cedar");[2] the Pediatric Group, LLP ("PG" or "Pediatric Group"); the Pediatric Group and Families Too!, LLC ("PGFT" or "Pediatric Group and Families"); Pediatric Specialists of

---

[1] "Qui tam is short for *'qui tam pro domino rege quam pro se ipso in hac parte sequitur,'* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

[2] Plaintiff has informed the Court that Cedar "merged into" HHH and that HHH is now "responsible" for CHV's "liabilities." ECF 88.

Annapolis, LLP ("PSA" or "Pediatric Specialists"); and plaintiff's former employer, Ancillary Services, Inc. ("ASI" or "Ancillary"). ECF 1, ¶¶ 14–16.[3]

Suit was filed, under seal, on July 28, 2014.  ECF 1.[4]  It is lodged pursuant to the False Claims Act ("FCA" or the "Act"), 31 U.S.C. §§ 3729 *et seq.*, and, initially the Maryland False Health Claims Act, Md. Code (2023 Repl. Vol., 2025 Supp.), §§ 2-601 *et seq*. of the Health-General Article ("H.G.").[5]  Hayden, who was previously employed as Chief Financial Officer ("CFO") of ASI (ECF 1, ¶ 3), alleges that defendants, "at the direction of Dr. Graw, implemented a scheme to bill at least 85% of patient visits" at a higher billing code, "falsely representing the complexity of the medical care provided," so as "to increase their revenue[.]"  *Id.* ¶ 59.

While the suit was sealed, the government conducted a lengthy investigation to determine whether to intervene. *See* ECF 2; ECF 4; ECF 6; ECF 8; ECF 10; ECF 13; ECF 15; ECF 19; ECF 22; ECF 26; ECF 29; ECF 32; ECF 34; ECF 36; ECF 38; ECF 40; ECF 42; ECF 44; ECF 46; ECF 48; ECF 50; ECF 52; ECF 54; ECF 56; ECF 58; ECF 60; ECF 62; ECF 64; ECF 66. Eventually, on June 30, 2025, the United States declined to intervene. ECF 68. Then, on July 8, 2025, the State of Maryland also declined to intervene and asked the Court to dismiss all claims asserted on its behalf, without prejudice.  ECF 70.  I granted the State's request.  ECF 71.  The suit was unsealed on September 30, 2025. ECF 72.[6]

---

[3] In this Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

[4] The case was originally assigned to Judge J. Frederick Motz.  It was reassigned to me on August 7, 2018, due to the retirement of Judge Motz.  *See* Docket.

[5] The FCA's sealing provision is found at 31 U.S.C. § 3730(b)(2).  The corresponding State provision is found at H.G. § 2-604(3)(ii).

[6] By Order of June 30, 2025, I directed the Clerk to unseal the Complaint, my Order, and future filings, and directed the Relator to serve the Complaint on defendants. ECF 69; *see Am. C.L.*

Defendants have moved to dismiss the suit, pursuant to Fed. R. Civ. P. 12(b)(6) and Rule 9(b).  ECF 99; ECF 99-1  (collectively, the "Motion").[7]  In particular, defendants contend that the Complaint fails to plead presentment with particularity and fails to plead defendant-specific FCA liability as to Coleman, Weber, Gonella, and Bresnahan.  ECF 99-1 at 5, 8. Defendants ask the Court to dismiss the Complaint, with prejudice, claiming that the Relator has conceded that he has no additional evidence to support his claims.  *Id.* at 10.

Relator opposes the Motion.  ECF 102 (the "Opposition").  In the alternative, Relator seeks leave to amend his Complaint.  *Id.* at 16.  Relator appended two exhibits to his Opposition.  ECF 102-2; ECF 102-3. Defendants replied.  ECF 103.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.      Factual Background[8]

### A.  The Parties

Harcart, Cedar, and Family Urgent Care, together doing business as Right Time Medical Care ("Right Time"), operated "approximately twelve (12) 'urgent care' facilities" in Maryland.

---

*Union v. Holder,* 673 F.3d 245, 251 (4th Cir. 2011) ("If the United States declines to intervene, it notifies the court and the qui tam relator. The complaint is then unsealed, the docket is unsealed, and the qui tam relator serves the complaint on the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure."); *see also Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 932 (10th Cir. 2005) ("After the Government . . . declines to intervene, the complaint is unsealed and served on the defendant."). Upon my review of the Docket on September 30, 2025, there was no indication of service. I also noted that the Clerk did not unseal the Complaint or my Order (ECF 69), as I had instructed. *See* ECF 69.  The error was corrected on September 30, 2025. *See* Docket.

[7] The Motion, one page in length, mentions only Rule 12(b)(6).  *See* ECF 99.  However, the supporting memorandum (ECF 99-1) references Rule 9(b). *Id.* at 2.

[8] As discussed, *infra,* at this juncture I must assume the truth of the facts alleged in the suit. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019).  Therefore, the factual summary is derived largely from the Complaint.

ECF 1, ¶ 44.[9]  At the time suit was filed, Right Time was "in the process of opening an additional facility."  *Id.*  Plaintiff asserts that approximately "15% of Right Time's patients are Medicare patients," "15% are Medicaid patients", and the "remainder are either privately insured, or uninsured."  *Id.* ¶ 50.

Pediatric Group, Pediatric Group and Families, and Pediatric Specialists, doing business as "'The Pediatric Group' operate three pediatric medical facilities" in Maryland.  *Id.* ¶ 48.  According to plaintiff, about "20% of the Pediatric Group's patients are Medicaid patients" and the "remainder are either privately insured, or uninsured."  *Id.* ¶ 51.

Ancillary "performed the business operations for HHH, CHV, FUC, PG, PGFT, PSA and related entities."  *Id.* ¶ 49.  Hayden served as CFO of Ancillary from November 2013 to approximately May 9, 2014.  *Id.* ¶¶ 3, 63.  As CFO of ASI, Relator "had access to the Right Time's billing data."  *Id.* ¶ 63.  According to plaintiff, ASI submitted "bills to Medicare, Medicaid and other payers."  *Id.* ¶ 49.

Dr. Graw is the Chief Executive Officer ("CEO") of Right Time, Pediatric Group, and Ancillary.  *Id.* ¶ 4.  Bresnahan is the COO of those entities.  *Id.* ¶ 8.  Dr. Coleman, Dr. Weber, and Gonella "are the members of Right Time's medical Review Committee (the 'MRC')."  *Id.* ¶ 47.  Dr. Graw, Dr. Coleman, and Dr. Weber are licensed to practice as physicians in Maryland, and Gonella is licensed to practice as a physician's assistant.  *Id.* ¶¶ 4–8.

According to the Relator, Dr. Graw has "engineered" a billing scheme "to support a lavish lifestyle . . . ."  *Id.* ¶ 70.  Relator claims: "Dr. Graw draws over $3,000,000 annually or more through various entities under his control in direct and indirect compensation, in addition to expensing personal amounts of a significant nature through the organizations."  *Id.*  In Relator's

---

[9] Plaintiff does not specify when defendants began operating these facilities.

view, Dr. Graw's income "is excessive for a pediatric and urgent care practice of this size, as practices of this nature, if operated honestly, produce relatively modest profit margins as reflected in the modest amounts properly billed per patient visit." *Id.*

### B.  Medicare and Medicaid

Relator contends that both Medicare and Medicaid were repeatedly overcharged by defendants.  I turn to review both programs.

### 1.  Medicare

In 1965, Congress passed Title XVIII of the Social Security Act, "which established the Medicare Program to provide health insurance for the elderly and disabled." *Id.* ¶ 18.  Medicare "is a health insurance program for people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant)." *Id.* ¶ 19.

Medicare is composed of three main programs: Part A; Part B; and Part D.  *Id.* ¶ 20.  Part A "helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care)." *Id.* ¶ 21.  "Part A also helps cover hospice care and some home health care." *Id.*  Part B "helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A." *Id.* ¶ 22.  "Part B also helps pay for covered health services and supplies when they are medically necessary." *Id.*  Part D "provides beneficiaries with assistance in paying for out-patient prescription drugs." *Id.* ¶ 23.

Medicare payments "come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions." *Id.* ¶ 24.  The United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services

("CMS"). *Id.* ¶ 25. "Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government." *Id.* ¶ 26.

As to Medicare Part B, "the federal government contracts with insurance companies and other organizations known as 'Medicare carriers' or 'Medicare Administrative Contractors' ('MAC's') to handle payment for physicians' services in specific geographic areas." *Id.* ¶ 27. These private insurance companies "are charged with and responsible for accepting Medicare claims, determining coverage and making payments from the Medicare Trust Fund." *Id.* ¶ 28.[10]

To bill Medicare Part B, the provider "must submit an electronic or hard-copy claim form called the CMS 1500 (formerly the HCFA 1500)." *Id.* ¶ 29. This form "identifies, among other things, the provider, the patient, the referring physician, the services provided, the diagnosis code, and the amount charged." *Id.* The provider must certify on the form "that the services billed on the form were 'medically indicated and necessary for the health of the patient.'" *Id.* ¶ 29. All health care providers, including physicians, "must comply with applicable statutes, regulations and guidelines" in order to obtain reimbursement. *Id.* ¶ 30. And, "providers that bill Medicare for services also have a duty to be knowledgeable about the statutes, regulations and guidelines regarding coverage for those services." *Id.*

Of import, "Medicare covers only reasonable and necessary medical services." *Id.* (citing 42. U.S.C. § 1395y(a)(1)(A) and *id.* § 1320c-5(a)(1)). "Similarly, Medicare regulations explicitly exclude from payment services that are not reasonable and necessary for the diagnosis or treatment of illness or injury." ECF 1, ¶ 30 (citing 42 C.F.R. 411.15(k)(1)). Furthermore, "Federal law specifically prohibits providers from making 'any false statement or representation of a material

---

[10] Novitas Solutions, Inc. is the private insurer that administers the Medicare program in Maryland. ECF 1, ¶ 28.

fact in any application for any . . . payment under a Federal health care program.'"  ECF 1, ¶ 31 (quoting 42 U.S.C. § 1320-a-7b(a)(1)).  In addition, federal law "requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other Federal health care programs to disclose those omissions or errors to the government."  ECF 1, ¶ 32 (citing 42 U.S.C. § 1320-a-7b(a)(3)).  The "requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program, and other Federal and State funded health care programs."  ECF 1, ¶ 32 (citing 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2)).

At the relevant time, "Defendants submitted claims to Medicare for Part B services rendered to Medicare beneficiaries to the designated Medicare Part B Carrier in Maryland."  ECF 1, ¶ 35.  Relator asserts that several of the defendants "are, or have previously been, enrolled with the Medicare Program and have been assigned multiple National Provider Identifier ('NPIs')[.]"  *Id.* ¶ 33.  And, "Defendants have agreed in the Medicare Enrollment Applications they signed" to follow Medicare's laws, regulations, and program instructions, including not to "'knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare,' and to 'not submit claims with deliberate ignorance or reckless disregard for their truth or falsity.'"  *Id.* ¶ 34.

### 2.  Medicaid

Medicaid is a joint federal-state public assistance program that pays for medical expenses for low income individuals. ECF 1, ¶¶ 36, 37; *see Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 (2003).  It is "administered by the states" and funded by both federal and state monies. ECF 1, ¶¶ 37, 38.  Indeed, it "is the largest source of funding for medical and health-related services for America's poorest people."  *Id.* ¶ 36.

"[I]n order to receive federal matching funds a state Medicaid program must meet certain minimum coverage and eligibility standards." *Id.* ¶ 40. In particular, a "state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind." *Id.* It must also provide "certain basic services, including inpatient and outpatient hospital services." *Id.*

HHS is responsible for "the administration, supervision and funding" of the federal Medicaid program and CMS is the division of HHS that "is directly responsible for administering the federal Medicaid program." *Id.* ¶ 41. In Maryland, the Department of Health and Mental Hygiene ("DMMH") administers the Medicaid program. *Id.* ¶ 42. If a provider seeks to enroll as a Maryland Medicaid provider, the provider "must submit an enrollment application to the DHMH." *Id.* Relator asserts: "Defendants submitted claims to the DHMH for services rendered to Medicaid beneficiaries in Maryland." *Id.* ¶ 43.

### C. Defendants' Alleged Billing Practices

Relator claims that, "like other health care providers," the defendants, when billing for services to Medicare and Medicaid, "designate the services that have been provided by using Current Procedural Terminology ('CPT') codes." ECF 1, ¶ 52.[11] This "CPT code set describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes." *Id.* Relator posits: "The services provided by urgent care and pediatric facilities generally fall within ten CPT codes relating to the evaluation and management ('E/M') of non-life threatening medical

---

[11] According to Relator, "[t]he CPT code set is a medical code set maintained by the American Medical Association through the CPT Editorial Panel." ECF 1, ¶ 52.

conditions that require immediate care."  *Id.* ¶ 53.

The Relator included the following table, reproduced below, of the CPT codes used to bill

for services provided to new patients.  *Id.* ¶ 54.

| Level[12] | CPT Code | History | Physical Exam | MDM Complexity[13] | Time[14] | Cost[15] |
|---|---|---|---|---|---|---|
| 1 | 99201 | Problem Focused | Problem Focused | Straightforward | 10 | $44.43 |
| 2 | 99202 | EPF[16] | EPF | Straightforward | 20 | $76.28 |
| 3 | 99203 | Detailed | Detailed | Low | 30 | $110.64 |
| 4 | 99204 | Comprehensive | Comprehensive | Moderate | 45 | $169.75 |
| 5 | 99205 | Comprehensive | Comprehensive | High | 60 | $211.37 |

The CPT codes for existing patients, according to Relator, are, *id.* ¶ 55:

| Level | CPT Code | History | Physical Exam | MDM Complexity | Time | Cost |
|---|---|---|---|---|---|---|
| 1 | 99211 | None | None | None | 5 | $21.58 |
| 2 | 99212 | Problem Focused | Problem Focused | Straightforward | 10 | $46.84 |
| 3 | 99213 | EPF | EPF | Low | 15 | $77.91 |
| 4 | 99214 | Detailed | Detailed | Moderate | 25 | $114.76 |
| 5 | 99215 | Comprehensive | Comprehensive | High | 40 | $153.38 |

[12] Relator does not define the term "Level."  *See* ECF 1 at 9–10.  But, elsewhere in the Complaint, he refers to them as "billing levels" or as a "billing code."  *See, e.g., id.* ¶¶ 61, 66 (quotation marks omitted).

[13] Relator defines MDM as "Medical Decision Making."  ECF 1 at 9 n.1.

[14] Relator does not specify what unit of time is measured in his charts.  *See* ECF 1 at 9–10. But, he alleges: "The time spent with physicians at Right Time is typically just 5-8 minutes, which is most closely commensurate with a Level 1 visit, as per Medicare guidelines."  *Id.* ¶ 58. Accordingly, the Court assumes that the time referenced in the charts represents the number of minutes associated with a particular medical service and a corresponding CPT code and billing level.

[15] Relator asserts: "Current rates [are] available using the search engine on the website of the Center for Medicare & Medicaid Services."  ECF 1 at 9 n.2.  He adds: "Historical rates may be different.  Rates shown are for Baltimore and surrounding counties.  Rates for locations in the Washington, DC area are slightly higher.  Rates for locations in Maryland outside of the Washington and Baltimore areas are slightly lower."  *Id.*

[16] Relator defines EPF as an abbreviation for "Expanded Problem Focused."  ECF 1 at 9 n.3

Relator contends that "the price discrepancy between a Level 3 (the more typical billing code, generally for urgent care visits) and Level 4 visit is quite substantial – a difference of approximately $60 for new patients, and $40 for existing patients." *Id.* ¶ 66. And, the "price discrepancy between Levels 3 and 5 is even greater – $110 for new patients, and $76 for existing patients." *Id.* According to Relator, "[m]ost visits to urgent care facilities are properly coded as Level 3[.]" *Id.* ¶ 57.

Hayden alleges: "Most patients presenting at urgent care facilities present with fairly minor illnesses or conditions–over 60% present with a cough, cold and/or headache." *Id.* ¶ 56. Relator claims that the same is true for patients at "pediatric facilities, such as those operated by the Pediatric Group." *Id.* ¶ 56. He posits: "Most urgent care visits at Right Time . . . should be coded at Level 3 or lower." *Id.* ¶ 58.

According to Relator, a patient typically spends 5–8 minutes with physicians at Right Time, "which is most closely commensurate with a Level 1 visit, as per Medicare guidelines." *Id.* ¶ 58. However, Relator claims that, under the direction of Dr. Graw, defendants "implemented a scheme to bill at least 85% of patient visits, both at Defendants' urgent care and pediatric facilities, at Level 4 or higher, using CPT codes 99204 and 99205 (for new patients) and 99214 and 99215 (for existing patients)." *Id.* ¶ 59. He posits that the "scheme was designed to defraud Medicare, Medicaid and private insurers, by falsely representing the complexity of the medical care provided in order to justify billing for a higher level of services" and to increase defendants' revenue. *Id.*

Moreover, Relator alleges that Dr. Graw and Bresnahan "frequently instructed Ms. Lynn Thomas, the Director of Billing, that 'everything' should be billed at Level 4." *Id.* ¶ 60. Relator also asserts that Dr. Graw "provided similar instructions to members of the MRC." *Id.* And,

Relator claims that Dr. Graw "instructed billing personnel to change the CPT codes entered by physicians to higher level codes before billing Medicare, Medicaid or certain private insurers." *Id.*

According to Relator, at weekly meetings of Right Time's medical directors and senior staff, "Dr. Graw would review the recent figures . . . as to average level of billing code per visit." *Id.* ¶ 61.   In these meetings, "Dr. Graw would frequently instruct the medical directors (the members of the MRC, Defendants Coleman, Weber and Gonella) to 'get the billing levels up to Level 4 or higher'." *Id.*   Moreover, Relator asserts that the medical directors "routinely pressure[d]" physicians employed by defendants to "'upcode' routine visits to Level 4 or Level 5 in order to achieve the coding targets established by Dr. Graw." *Id.*

As indicated, Relator previously served as the CFO of ASI (*id.* ¶ 3), which gave him "access to the Right Time's billing data." *Id.* ¶ 63.   He asserts that "Dr. Graw frequently directed the Relator to prepare a 'coding analysis'– a statistical summary showing what percentage of patient visits were billed at Levels 1 through 5, respectively for all providers", including physicians, nurse practitioners, and physician assistants. *Id.*   Relator claims that he "prepared these analyses at least on a weekly basis shortly after his employment began in November, 2013." *Id.*

Relator alleges: "Dr. Graw has communicated openly and widely throughout the organizations, for years, that all visits should be Level 4 or higher regardless of whether that coding is supported by the level of services actually provided." *Id.* ¶ 61.   Relator claims that Right Time "achieved a billing rate of 85%+ of patient visits at Level 4 or Level 5[.]" *Id.* ¶ 64.   He avers that this rate is "extraordinarily high compared with national averages for urgent care facilities." *Id.*

Plaintiff recounts that in "early 2013, SHR Associates, Inc. ('SHR'), a healthcare consulting firm, conducted an audit of Right Time's coding practice." *Id.* ¶ 69.   SHR analyzed "nine patient encounters selected by ASI." *Id.*   According to Relator, the findings from SHR's

audit were "reported in a memorandum to Ms. Thomas dated March 27, 2013[.]" *Id.*; *see* ECF 102-2 at 3–7 (the "SHR Audit" or the "Audit").

Hayden alleges: "SHR noted that '[e]very E/M service was coded as Level 4 for the new patient visits and established patient visits,' and that '[s]even of the nine encounters reviewed (78%) contained documentation that *did not support* the level of service coded'[.]"  ECF 1, ¶ 69 (quoting SHR Audit; alterations and emphasis in original); *see* ECF 102-2 at 3.  Additionally, the SHR Audit "noted that '[t]he medical record template' utilized by Right Time 'does not adequately capture the type of information that is required to meet the criteria for the various codes,' and that '[t]rauma procedures and x-rays were frequently not sufficiently documented to determine accurate CPT codes.'"  ECF 1, ¶ 69 (quoting SHR Audit; alterations and emphasis in original).

Between September and November 2013, "Right Time implemented a new clinical operating system called eClinicalWorks ('ECW'), which included an 'auto-code' function, which would automatically generate the CPT code based on the services described in the entry made by the attending physician."  ECF 1, ¶ 65.  Relator asserts that "the auto-code function was not producing enough of the lucrative Level 4 and Level 5 codes that Dr. Graw desired, and the percentage of visits  billed at Level 4 of [sic] Level 5 temporarily dropped to approximately 70%."  *Id.*  But, the rate of coding "at Level 4 or higher subsequently returned to prior levels."  *Id.*

Then, in January 2014, "Dr. Graw informed physicians that the auto-code function was 'broken' and should no longer be used."  *Id.*  Relator "confirmed with ECW that there were no issues with the auto-coding feature of the software."  *Id.* According to Relator, "Dr. Graw concocted the story that auto-code was 'broken,' and communicated [this lie] to all providers during a weekly 'provider huddle' in January 2014."  *Id.*  Furthermore, Relator alleges that "Dr.

Graw . . . instructed the ECW system trainers, Lynne Thomas and Sam Tripoli, to instruct all providers 'not to use the system auto-coder' because 'it is broken and does not work'." *Id.*

Relator recounts that on March 29, 2014, "Ms. Thomas forwarded SHR's report to Dr. Graw and Ms. Bresnahan, under a cover memorandum of that date." *Id.* ¶ 70; *see* ECF 102-2 at 2 ("Thomas Memorandum").   "Ms. Thomas noted that the report 'show[ed] issues with RMC coding.'"   ECF 1, ¶ 70 (quoting Thomas Memorandum).   Additionally, Ms. Thomas "noted the substantial differences between Level 4 and Level 3 billing, and warned that the difference 'could have a potential impact on our revenue by $3M.'"   *Id.* (quoting ECF 102-2 at 2).   According to Relator, Dr. Graw did not attempt to "remediate the issues noted by SHR[.]" ECF 1, ¶ 71.   Instead, "Dr. Graw directed that SHR's work cease immediately, as its preliminary findings were unfavorable." *Id.*

Further, Hayden claims that "[t]he Company"[17] received "periodic 'audit letters' from DHMH regarding higher than average coding levels for specific providers from time-to-time." *Id.* ¶ 67. [18]   According to Relator, DHMH automatically generates these letters "when billing patterns appear to differ substantially from industry norms." *Id.*   And, "DHMH requires recipients of such letters . . . to review the files, and if . . . documentation does not support the level of coding submitted on the claims, to reimburse the DHMH." *Id.*   The audit letters also "require[d] the submission of an 'expanded sample' of patients' files/claims in order to determine if more money may be due back to DHMH." *Id.*

---

[17] Although Relator has sued several companies, he does not specify which company he is referencing.  *See, e.g.,* ECF 1, ¶ 67.

[18] Relator asserts: "There is a paragraph numbering defect on pages 14–15 of the Complaint.. [sic] After Paragraph 71, on page 14, the numbering reverts to No. 67,' and there are four paragraphs with duplicative paragraph numbers." ECF 102 at 5 n.2.

According to Relator, defendants did not remit any funds to DHMH or perform expanded reviews, "for fear of significant liabilities to DHMH." *Id.* Indeed, Relator asserts: "[R]ecords were altered 'after-the-fact' in order to justify the original coding claim submitted." *Id.* Relator alleges that during his employment, "the company was recruiting for a 'certified coder.'" *Id.* ¶ 68. And, "[w]hile several qualified candidates were interviewed, Dr. Graw insisted that any coder hired by Defendants be 'on our side,' meaning he wanted the coder to support the requested CPT levels at all costs, and not 'interfere' with the scheme that has been in place for years to bill all patient visits at Level 4 or higher." *Id.*

In addition, Relator asserts that "in late 2012, the companies 'consolidated' all provider numbers into a single provider number, at least for purposes of insurer CareFirst of Maryland, and possibly Medicare and/or Medicaid." *Id.* ¶ 71. Therefore, "existing patients were treated as 'new' patients under the new consolidated provider number." *Id.* Relator alleges that this led "the company" to receive nearly "$30-$60 additional funds per patient visit from certain payors, when in fact, the patient was an 'existing' patient within the organization, previously seen within the prior three years." *Id.* According to Relator, this created a windfall to the company of "approximately $1,000,000." *Id.*

Relator posits: "Defendants bill approximately 30,000 urgent care patient visits per year (approximately 15% of 200,000 total patient visits) to Medicare." ECF 1, ¶ 67. Further, he claims that "at least 30% of these urgent care visits are 'upcoded,' i.e., billed at higher-revenue billing codes than they should have been billed at." *Id.* According to Relator, the "cost to Medicare is at least $300,000 per year." *Id.* Hayden also avers that defendants bill about 30,000 urgent care patient visits per year to Medicaid, *i.e.*, about 15% of 200,000 total patient visits. *Id.* ¶ 68.

According to Relator, 30% of these urgent care visits are upcoded, costing Medicaid at least $300,000 per year. *Id.*

## II.      The False Claims Act

Relator has filed suit pursuant to the False Claims Act of 1986, 31 U.S.C.  3729 *et seq.* The FCA protects the government fisc by "impos[ing] civil liability on persons who knowingly submit false claims for goods and services to the United States." *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 39 (4th Cir. 2016); *see United States ex rel. Sheldon v. Allergan Sales, LLC*, 170 F.4th 227, 232 (4th Cir. 2026) (stating that the FCA "'imposes liability on those who knowingly present a false or fraudulent claim for payment or approval' to the government.") (quoting *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023) (cleaned up)); *see also Leverette v. Louis Berger U.S., Inc.*, 2024 WL 2355419, at *1 (4th Cir. May 23, 2024) (per curiam); *Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014), *cert. denied*, 574 U.S. 819 (2014).  The Act dates to 1863, when Congress passed the statute "to provide a mechanism for the government to redress fraud in government procurement during the Civil War." *Sheldon,* 170 F.4th at 232.

"A claim is defined as 'any request or demand' for money or property presented to either an officer, employee, or agent of the United States or . . . a grantee or other recipient of federal funds if, among other things, the United States government will reimburse the grantee or recipient for the funds requested." *Sheldon*, 170 F.4th at 233 (citing 31 U.S.C. § 3729(b)(2)).  In 31 U.S.C. § 3729(a)(1)(A), it provides that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States government."  This is referred to as a "presentment claim[.]" *United States ex rel. Wheeler v. Acadia Healthcare Co., Inc.*, 127 F.4th 472, 486 (4th Cir. 2025).

As in this case, "the FCA is often invoked to seek redress for fraud committed against government healthcare programs[.]" *Sheldon,* 170 F.4th at 233. In order to prevent fraud that might otherwise evade detection and to supplement government enforcement, the FCA "incentivizes" private individuals, called whistleblowers, and "deemed 'relators,'" to file civil lawsuits on behalf of the government against those who defraud the federal government. *Wheeler*, 127 F.4th at 479. To encourage such suits, the statute allows a successful relator to collect a portion of the government's recovery. *See* 31 U.S.C. § 3730(b); *see Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011).

"In general, a False Claims Act relator is required to allege four elements: (1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a "claim").'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 188 (4th Cir. 2022) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)); *see United States ex rel. Kyer v. Thomas Health Sys., Inc.,* 178 F.4th 119, 129 (4th Cir. 2026); *Sheldon,* 170 F.4th at 233; *Wheeler*, 127 F.4th at 487; *Rostholder*, 745 F.3d at 700. In short, a "defendant can only be held liable under the FCA . . . if the defendant possessed the requisite scienter and the claim submitted was objectively false." *Sheldon,* 170 F.4th at 233. "Failure to adequately allege any of these elements dooms a claim." *Wheeler*, 127 F.4th 487 (quotation marks and citation omitted).

As to the first element, falsity, "Congress did not define what makes a claim false or fraudulent." *Taylor*, 39 F.4th at 200 (quotation marks and citation omitted). But, the phrase "false or fraudulent claim" is construed broadly. *Harrison*, 176 F.3d at 788. The Court relies "on the well-settled meaning of the common law terms used in the statute." *Wheeler,* 127 F.4th at 487.

"At common law, a false statement encompassed any 'words or conduct' that 'amount[ ] to an assertion not in accordance with the truth,' Restatement (Second) of Torts § 525 cmt. b (1977), including a 'representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying [information],' *id.* § 529." *Taylor*, 39 F.4th at 200–01.

"Congress amended the Act in 1986 to strengthen its scienter requirement." *Sheldon,* 170 F.4th at 232. It is "purposefully broad to combat the ostrich-like conduct which can occur in large corporations that poses insurmountable difficulties for civil false claims recoveries." *Id.* at 233 (cleaned up) (citation omitted).

In *Schutte*, 598 U.S. 739, the Supreme Court provided an exegesis of the FCA's scienter element. In interpreting the scienter requirement, the Supreme Court "start[ed] . . . with the text of the FCA." *Id*. at 749. The Court observed that under 31 U.S.C. § 3729(b)(1)(A)(i)–(iii), "either actual knowledge, deliberate ignorance, or recklessness . . . suffice" for liability under the FCA. *Schutte*, 598 U.S. at 750. According to the Court, this "three-part test largely tracks the traditional common-law scienter requirement for claims of fraud." *Id.* (citations omitted). Therefore, the Court determined that scienter under the FCA, like scienter under common law fraud, "ordinarily 'depends on a subjective test' and the defendant's 'culpable state of mind.'" *Id.* at 752 (quoting Restatement (Third) of Torts § 10, Comment *a*). In other words, "[t]he FCA's scienter requirement refers to [a defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person might have known or believed." *Schutte*, 598 U.S. at 749.

Given that the "scienter standard is a subjective one," the Act "prohibits the submission of a false claim to the federal government if the defendant either subjectively believed the claim to be false or was substantially aware of the risk of it being so." *Sheldon,* 170 F.4th at 232; *see*

*Schutte*, 598 U.S. at 749.  "The subjective scienter standard prevents wrongdoers from taking advantage of arguable ambiguity in a statute to exploit the public fisc for private gain."  *Sheldon,* 170 F.4th at 245.

As to materiality, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 579 U.S. 176, 192 (2016).  "In order to meet the materiality requirement, the fraud alleged under the False Claims Act must be 'so central to' the purpose of the government contract that the government 'would not have paid the[ ] claims had it known of the[ ] violations.'"  *Wheeler*, 127 F.4th at 489 (quoting *Escobar*, 579 U.S. at 196).  However, "[t]he failure to follow a 'minor or insubstantial' requirement . . . does not suffice to show materiality."  *Wheeler*, 127 F.4th at 489 (quoting *Escobar*, 579 U.S. at 194).

The last element of an FCA claim "requires that the fraudulent statement or conduct 'caused the government to pay out money or to forfeit moneys due.'"  *Wheeler*, 127 F.4th at 491 (quoting *Taylor,* 39 F.4th at 188).  The plaintiff  must "establish submission of a false claim," *i.e.* presentment.  *Wheeler,* 127 F.4th at 491; *see United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018).  I discuss presentment in more detail, *infra*.

### III.    Standards of Review

### A.  Fed. R. Civ. P. 12(b)(6)

Defendants have moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959

F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *cert. denied*, 583 U.S. 1008 (2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). Thus, "a ruling under Rule 12(b)(6) presents a pure question of law[.]" *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ." *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see Brown-Hyatt v. Brenner*, SAG-25-1737, 2025 WL 2855769, at *2 (D. Md. Oct. 8, 2025) (same).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'"); *see also Aljizzani v. Middle E. Broad. Networks, Inc.,* 178 F.4th 863, 868 (4th Cir. 2026); *Jiang v. Duke University*, 2026 WL 1623430,

at \*4 (4th Cir. June 5, 2026) (per curiam); *Kyer*, 178 F.4th at 128; *Rice v. Adams,* 172 F.4th 428, 432 (4th Cir. 2026); *Sheldon*, 170 F.4th at 242; *L.M. by Roe #1 v. Graham*, 168 F.4th 196, 200 (4th Cir. 2026); *Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 814 (4th Cir. 2026); *Harmon v. Coleman Worldwide Moving, LLC*, 2025 WL 3764220, at \*1 (4th Cir. Dec. 30, 2025) (per curiam); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).

A plausible claim is one that is more than merely conceivable or speculative. *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see Sheldon*, 170 F.4th at 242. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As the Fourth Circuit has recognized, plaintiffs are not required "to prove [their] case in the complaint." *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) (recognizing that "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset"); *see Lowy v. Daniel Defense, LLC,* 167 F.4th 175, 193 (4th Cir. 2026). Furthermore, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Indeed, it is "error" for a

district judge to give "a serious claim the back of its hand" because it does not believe the plaintiff's allegations. *See Colon Health Ctrs. of Am., LLC v. Hazel,* 733 F.3d 535, 545 (4th Cir. 2013).

Rather, in considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Brunenkant v. Suburban Hosp., Inc.*, 176 F.4th 329, 333 (4th Cir. 2026); *Nichols v. Bumgarner*, 173 F.4th 511, 520 (4th Cir. 2026); *Env't Hydrogeological Consultants, Inc. v. N. Am. Risk Servs., Inc.,* 2026 WL 674349, at *2 (4th Cir. Mar. 10, 2026); *Cooper v. City of Wheeling*, 169 F.4th 220, 223 (4th Cir. 2026); *Walls v. Prince George's Cnty.*, 2026 WL 497988, at *1 (4th Cir. Feb. 23, 2026) (per curiam); *Johnson*, 163 F.4th at 814; *Bermeo v. Andis*, 163 F.4th 87, 93 (4th Cir. 2025)*; Hebb v. City of Asheville, N. Carolina,* 145 F.4th 421, 432 (4th Cir. 2025); *Barbour v. Garland,* 105 F.4th 579, 589 (4th Cir. 2024); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). Nor does the court accept "'legal conclusions couched as facts . . . .'" *Taylor*, 39 F.4th at 189 (citation omitted).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th.

Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). Mere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022) (unpublished); *see Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

That said, a plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted); *see Johnson v. Navy Fed. Credit Union*, 2025 WL 2437832, at *2 (4th Cir. Aug. 25, 2025) (per curiam).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555; *see Aljizzani*, 178 F.4th at 868 (same). "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678; *see Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025). Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Ordinarily, when ruling on a Rule 12(b)(6) motion, a court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*,

825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Harrold v. Hagen*, 174 F.4th 393, 400 (4th Cir. 2026); *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *Bing v. Brivo Sy*s., LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismsiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear [ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

Moreover, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Redding v. Noem,* 168 F.4th 203, 205 (4th Cir. 2026); *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Under limited circumstances, however, a court may consider documents beyond the complaint, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider documents that are explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits[.]" *Goines,* 822 F.3d at 166; *see* Fed. R. Civ. P. 10(c). A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Qader v. Federal Home Loan Mortgage Corp.,* 2026 WL 1818380, at *2 (4th Cir. June 24, 2026) (unpublished); *Finn v. Humane Soc'y of the United States*, 160 F.4th 92, 96 n.2 (4th Cir. 2025);

*Doriety,* 109 F.4th at 679; *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Carrington Sturgis v. Warden Jeff Nines*, SAG-25-841, 2025 WL 3240039, at *2 (D. Md. Nov. 20, 2025); *Moody v. The Board of Education of Wicomico* County, SAG-25-00642, 2025 WL 3119201, at *4 (D. Md. Nov. 7, 2025).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in *Chesapeake Bay Found., Inc.*) (citation omitted); *see Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam). Additionally, "A document is 'integral' to a complaint if it is quoted, relied upon, or incorporated by reference in the complaint." *Mullan v. Antero Res. Corp.*, TSK-24-62, 2025 WL 746523, at *3 (N.D.W. Va. Mar. 7, 2025) (quoting *Roberts v. Barnes*, TSK-22-65, 2023 WL 3656892, at *4 (N.D.W. Va. May 25, 2023)); *see Celester v. Baker Buick & GMC,* 2023 WL 4422533, at *4 (D.S.C. June 21, 2023) (concluding that a document has "been incorporated into the Complaint by reference" when the "Plaintiff quotes several of the provisions [of the document] with his Complaint"), *report and recommendation adopted*, BHH-22-1748, 2023 WL 4421817 (D.S.C. July 10, 2023); *Harris v. Virginia*, JRS-07-701, 2008 WL 4145923, at *2 (E.D. Va. Sept. 8, 2008) ("[T]he court may consider . . . documents that are central to the plaintiff's claim, and documents quoted or incorporated by reference in the plaintiff's complaint, provided that their authenticity is not disputed.")

Relator has appended two exhibits to his Opposition: (1) the SHR Audit and the Thomas Memorandum (ECF 102-2); and (2) a sample DHMH letter addressed to HHH (ECF 102-3, the "DHMH Letter").[19]

As to the SHR Audit, plaintiff reasons that the document is "undoubtedly integral to the complaint" because it is "expressly referenced and discussed in some detail in the Complaint[.]" ECF 102 at 4 n.1.  I agree.

To support plaintiff's allegations of upcoding, he extensively quotes the SHR Audit and the Thomas Memorandum.  *See* ECF 1, ¶¶ 69, 70.  Moreover, defendants do not dispute the authenticity of the SHR Audit or the Thomas Memorandum.  *See* ECF 103.  Because the SHR Audit and Thomas Memorandum are incorporated by reference in the Complaint, I shall consider them in adjudicating defendants' Motion.

Turning to the DHMH Letter, ECF 102-3, Relator asserts that it is "integral to the complaint, as the Complaint discusses the fact of these audit letters pointing out irregular billing patterns, and Exhibit B is an exemplar of such letters."  ECF 102 at 5 n.3.  In the Complaint, Relator claims: "The Company has received periodic 'audit letters' from DHMH regarding higher than average coding levels for specific providers from time-to-time."  ECF 1, ¶ 67.  According to Relator, the DHMH letter is an example of the type of letter Relator described in his Complaint.

I am satisfied that the DHMH letter is incorporated by reference in the Complaint. Therefore, I may consider it in evaluating the sufficiency of Relator's allegations.

### B.  Fed. R. Civ. P. 9(b)

Defendants have also moved to dismiss under Fed. R. Civ. P. Rule 9(b).  It states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud

---

[19] Relator redacted the documents to protect the identity of patients.  ECF 102 at 5 n.2.

or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

A suit brought under the FCA sounds in fraud, and thus is "subject to" Rule 9(b), "which requires that claimants plead fraud with particularity." *Harrison*, 176 F.3d at 783–84. A relator must satisfy the "heightened pleading standard" of Rule 9(b). *Sheldon*, 170 F.4th at 242; *see Kyer*, 178 F.4th at 128–29; *Grant*, 912 F.3d at 196; *Josephs v. Amentum Servs. Inc.,* SAG-25-01477, 2025 WL 3223772, at *4 (D. Md. Nov. 19, 2025) (same). The relator "must do more than merely describe a scheme and allege, without factual detail, that claims requesting illegal payments 'must have been' or 'were likely to have been' or 'should have been submitted to the Government.'" *Kyer,* 178 F.4th at 129 (quoting *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013)).

Rule 9(b) serves several purposes. In *Harrison*, 176 F.3d 776, the Court explained, *id.* at 784 (citation omitted):

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

The Fourth Circuit has "adhered firmly to the strictures of Rule 9(b) in applying its terms to cases brought under the Act." *Nathan*, 707 F.3d at 456. "A 'complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud.'" *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mar. 29, 2016) (citing *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000)). "The court must be satisfied that the complaint gives notice to the defendants 'of the particular

circumstances for which [they] will have to prepare a defense at trial,' and that 'plaintiff has substantial prediscovery evidence of those facts.'" *Kyer*, 178 F.4th at 129 (quoting *Harrison*, 176 F.3d at 784, 789).[20]

"Failure to comply with the particularity standard [of Rule 9(b)] is a failure to state a claim under Rule 12(b)(6)." *Kyer*, 178 F.4th at 129. Because "the particularity standard is steep", the Fourth Circuit has warned that "[f]or future relators, it may be wise to err on the side of saying too much to avoid a kick from Rule 12(b)(6)." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.,* 42 F.4th 185, 196 (4th Cir. 2022).

Under the heightened pleading standard of Rule 9(b), a plaintiff alleging a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Nathan*, 707 F.3d at 455 (citation omitted); *see K.C. Co., Inc. v. Pella Corp.*, 2024 WL 1554759, at *1 (4th Cir. Apr. 10, 2024) (per curiam); *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010); *see also Harrison*, 176 F.3d at 784. In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted); *see Sheldon*, 170 F.4th at 242; *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008).

---

[20] Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation." *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

Several cases have clarified Rule 9(b)'s "who," "what," and "when" requirements in the context of the FCA. As to "who," in cases where the defendant is a corporate entity, Rule 9(b) requires the plaintiff to name the individuals involved in the allegedly fraudulent conduct. *See, e.g.*, *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 145 (N.D. Ill. 1993) (stating that Rule 9(b) requires a plaintiff asserting a FCA claim against a corporate defendant to specify the "identity and/or role of the individual employee involved in the alleged fraud."). With respect to "what," a plaintiff must show a link between allegedly wrongful conduct and a claim for payment actually submitted to the government. *See, e.g.*, *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (noting that Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted to the Government."), *cert. denied*, 537 U.S. 1105 (2003). As to "when," Rule 9(b) requires a plaintiff to allege with particularity the dates of the supposed fraudulent conduct. *See, e.g.*, *United States ex rel. Cericola v. Fed. Nat'l Mortg. Ass'n*, 529 F. Supp. 2d 1139, 1146 (C.D. Cal. 2007) (stating that Rule 9(b)'s requirements were not fulfilled when, among other deficiencies, a plaintiff's complaint alleged that FCA violations occurred between 1995 and 1998 but did not allege any specific dates).

Scienter is also an element under the FCA. "Scienter refers to the degree of knowledge an individual must possess in order to be held liable under the" Act. *Sheldon,* 170 F.4th at 232; *see Schutte*, 598 U.S. at 750. The Act imposes liability only when a person "knowingly" makes a false claim to the government. 31 U.S.C. § 3279(a)(1)(A). "[T]he terms 'knowing' and 'knowingly' . . . mean that a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information . . . ." *Id.* § 3279(b)(1)(A); *see Schutte*, 598 U.S. at 750; *Sheldon*, 170 F.4th at 241. But, "[e]ven in these fraud-based claims, scienter may be alleged generally." *Sheldon,* 170 F. 4th at 242. Indeed, it is a "low threshold." *Id.* at 243. "This is particularly true at the pleading stage before the parties have had an opportunity to engage in discovery." *Id.* at 242.

Of relevance, claims under the Act "'must be linked in some way to presenting a claim for payment to the government,' [and therefore] the relator must plead this 'presentment' element with particularity." *Kyer*, 178 F.4th at 129 (quoting *Nicholson*, 42 F.4th at 194). A plaintiff has two avenues to plead presentment. The Relator "must allege either (1) the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby,' or (2) a 'pattern of conduct that would *necessarily* have led to submission of false claims.'" *Kyer,* 178 F.4th at 129 (quoting *Nicholson*, 42 F.4th at 194) (emphasis in *Nicholson*); *see Wheeler*, 127 F.4th at 491; *United States ex rel. Elliott v. Frazier Aviation, Inc.*, DJN-23-881, __ F. Supp. 3d __, 2026 WL 1046672, at *17 (E.D. Va. Apr. 15, 2026).

But, "an FCA whistleblower need not 'produce documentation or invoices at the outset of the suit,' nor are they required to have 'specific knowledge of a company's financial and billing structure.'" *Wheeler*, 127 F.4th at 493 (quoting *Grant*, 912 F.3d at 199). "If an FCA whistleblower 'cannot allege the details of an actually submitted false claim, [the complaint] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Wheeler*, 127 F.4th at 493 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). The Fourth Circuit "requires only 'that plaintiffs connect the dots, even if unsupported by precise

documentation, between the alleged false claims and government payment.'" *Wheeler*, 127 F.4th at 493 (quoting *Grant*, 912 F.3d at 199).

To be sure, the "'clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed.'" *Harrison*, 126 F.3d at 789 (citation omitted); *see Wilson*, 525 F.3d at 380 ("[I]f allowed to go forward, Relators' FCA claim would have to rest primarily on facts learned through the costly process of discovery. This is precisely what Rule 9(b) seeks to prevent."). Indeed, "Rule 9(b)'s particularity requirement serves as a necessary counterbalance to the gravity and 'quasi-criminal nature' of FCA liability." *Grant*, 912 F.3d at 197 (quoting *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006)).

Nevertheless, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

## IV.   Discussion

Defendants argue that the Complaint is subject to dismissal on two grounds. *See* ECF 99-1 at 5–10.  First, defendants posit that the Relator failed to plead presentment with particularity. *Id.* at 5. Second, defendants contend that the Relator did not sufficiently allege an FCA claim against defendants Coleman, Weber, Gonella, and Bresnahan "with the particularity required" by Fed. R. Civ. P. 9(b). ECF 99-1 at 8.  Relator disputes each contention. *See* ECF 102 at 8–19.

### A.  Presentment

Defendants contend that Relator fails to plead presentment of the claims to the government with the requisite particularity.  ECF 99-1 at 5.  They maintain that Relator "is attempting to

proceed without the claim-level facts Rule 9(b) requires and instead [is seeking] to use discovery to identify claims after filing–an approach the Fourth Circuit has rejected." *Id.* (citing *Nathan,* 707 F.3d at 456–558); *see* ECF 99-1 at 8 (citing ECF 1, ¶ 78).

According to defendants, "the Complaint does not allege a single specific service provided by Right Time or The Pediatric Group that was improperly coded and billed to either Medicare or Medicaid." ECF 99-1 at 6. They maintain that the SHR Audit, which describes nine patient visits, does not constitute a "representative example of a false claim submitted for government payment" because "the Complaint does not allege that any of those visits were billed to a government payor, much less provide claim-level details establishing presentment." *Id.*; *see* ECF 103 at 3. Further, defendants argue: "The audit does not state that these patient encounters were overbilled. Rather, the audit report explains that inadequate documentation contributed to the inability to determine the level of complexity justified for each visit." ECF 103 at 3.

Moreover, defendants contend that Relator's allegations regarding lies that Dr. Graw allegedly told in January of 2014 fail to "identify any false claim presented to Medicare or Medicaid." ECF 103 at 4. According to defendants, "Rule 9(b) . . . requires more than a dateable internal act. It requires factual allegations tying the alleged conduct to an actual false claim." *Id.*

Further, defendants posit that Relator does not plead a "pattern of conduct that *necessarily* led to the submission of false claims[.]" ECF 99-1 at 6 (cleaned up) (emphasis in original). In their view, the allegations "do not establish that false claims were inevitably submitted to the Government; at most, they invite speculation that a government payor *might* have been overcharged at some unidentified time." *Id.* at 7 (emphasis in original). Defendants also dispute that the Fourth Circuit applies a relaxed pleading standard to a relator with insider knowledge of alleged fraud. ECF 103 at 8–9.

Plaintiff counters that defendants "overlook[] the substantial particularity with which the Complaint describes the fraudulent scheme–including specific actors, specific statements, specific dates, and specific acts of fraud directed at government payers." ECF 102 at 8. He relies on the SHR Audit to buttress his claims that, under defendants' scheme, the issuance of false claims was inevitable. *Id.* at 12. Hayden states, *id.* at 9: "The SHR audit is probative both as a representative sample and as compelling evidence of scienter[.]" Moreover, Relator observes that SHR "found substantial errors" in the sample of claims it reviewed, "at which time its work was abruptly cut off." *Id.* at 12 (citing ECF 1, ¶ 69–70). And, it was Dr. Graw who allegedly "terminated the audit immediately upon receiving unfavorable preliminary findings." ECF 102 at 9 (citing ECF 1, ¶ 71).

Furthermore, Relator claims he has alleged "a specific, identifiable act of fraud . . . with a precisely identified actor, a specific time, a specific audience, and a measurable, documented effect on billing levels submitted to Medicare and Medicaid." ECF 102 at 10. He points to "the January 2014 Auto-Code Suppression" incident in which "Dr. Graw falsely announced at a company-wide provider meeting that the auto-code function of the ECW system was 'broken' and should not be used—a statement Hayden personally confirmed was false after verifying directly with ECW." *Id.* at 9 (quoting ECF 1, ¶ 65). According to Relator, because of this "deliberate suppression of accurate, software-generated CPT codes in favor of manually inflated codes," fraudulent claims were submitted to Medicare and Medicaid. ECF 102 at 9 (citing ECF 1, ¶ 65).

Additionally, plaintiff maintains that he has satisfied Rule 9(b) because the "Complaint alleges a mandatory, actively enforced billing policy that necessarily led to the submission of false claims to the Government[.]" ECF 102 at 10. He notes that the Complaint describes "a mandatory billing *directive,* enforced by the CEO through weekly oversight meetings and direct personal

intervention, applied to every patient visit, at facilities that billed tens of thousands of claims per year to Medicare and Medicaid." *Id.* (emphasis in original).  Plaintiff also points to the DHMH letters that defendants received as corroboration of defendants' upcoding for services. *Id.* at 12.

Moreover, Relator emphasizes his personal knowledge of the fraudulent scheme. *Id.* at 13. He asserts: "He attended the weekly meetings at which Dr. Graw directed upcoding.  He personally prepared the weekly coding analyses that documented the scheme's results.  He personally verified that the auto-code software was functional." *Id.*  Accordingly, Relator reasons that "[h]is allegations are grounded in direct, first-hand observation–not speculation, not information and belief, and not a fishing expedition." *Id.*

Rule 9(b) constitutes "a pleading standard, and not a burden of proof." *United States ex rel. Hedley v. Abhe & Svoboda, Inc.*, 199 F. Supp. 3d 945, 955 (D. Md. 2016).  Therefore, as noted, a relator is "in no way require[d] . . . to produce documentation or invoices at the outset of the suit . . . ." *Grant*, 912 F.3d at 199; *see Wheeler*, 127 F.4th at 493.  Rather, Rule 9(b) merely "requires that plaintiffs connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment." *Grant*, 912 F.3d at 199.

"The critical question is whether the defendant caused a false claim to be presented to the government, because liability under the Act attaches only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme." *Nathan*, 707 F.3d at 456.  Of import, a relator may lodge "specific allegations of the defendant's fraudulent conduct [that] necessarily [lead] to the plausible inference that false claims were presented to the government." *Id.* at 457.

It is noteworthy that "upcoding" is "a common form of Medicare fraud[.]" *United States v. Kernan Hosp.,* RDB-11-2961, 2012 WL 5879133, at *1 n.2 (D. Md. Nov. 20, 2012).  The

practice entails "'billing Medicare [or Medicaid or a private insurer] for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided.'" *United States v. Akoto*, AAQ-25-157, 2025 WL 1702951, at *5 (D. Md. June 18, 2025) (quoting *Kernan Hosp.,* 2012 WL 5879133, at *1 n.2), *report and recommendation adopted,* TDC-25-0157, 2025 WL 2453432 (D. Md. July 21, 2025).  A relator who alleges that a provider has upcoded to receive inflated reimbursements from Medicare or Medicaid has sufficiently alleged cognizable false statements under the FCA.  *See Harris*, 275 F. Supp. 2d at 6 ("[U]pcoding is actionable under the FCA"); *see also Akoto,* 2025 WL 1702951, at *5.

As outlined, there are two avenues for claim presentment.  With respect to the first avenue, the Complaint does not "identify a specific false claim that was presented to" Medicare or Medicaid for payment.  *See Nicholson*, 42 F.4th at 194; *Grant,* 912 F.3d at 197.

The SHR Audit does not specify whether any of the nine patients whose appointments were audited were covered by Medicare or Medicaid.  *See* ECF 102-2 at 6–7.  Nor does the DHMH Letter identify a specific false claim.  It only indicates that the Office of the Inspector General of the DHMH "determined that the number of claims or the type of claims submitted" by Dr. Rhoden-Salmon, an HHH provider and not a named defendant, "diverges significantly from the claims submitted by her peers."  ECF 102-3 at 2.  Although the DHMH appended particular claims submitted by Dr. Rhoden-Salmon to the letter, the letter only asks HHH to "perform a self-audit" of those claims to determine if the doctor used the correct code for the service provided.  *Id.*

As mentioned, plaintiff also alleges that in January 2014, "Dr. Graw informed physicians that the auto-code function" in the ECW system was broken, and instructed the other physicians manually to code the services they provided.  ECF 1, ¶ 65.  Hayden asserts that he "confirmed with ECW that there were no issues with the auto-coding feature of the software," and he claims that

"Dr. Graw concocted the story" to produce more lucrative Level 4 and Level 5 codes. *Id.* But, this does not amount to a specific instance of presentment of upcoded bills to a government payor.

In sum, relator's Complaint is "devoid of any representative example of services that were actually billed to either Medicare or Medicaid, the date they were billed, the amount they were billed, and the amount of reimbursement received by any of the . . . Defendants." *See United States v. Bharti*, TSK-20-43, 2023 WL 6441941, at \*11 (N.D.W. Va. Sept. 29, 2023). Therefore, "Relator fails to adequately plead presentment through the first avenue." *See id.*

I turn to the second avenue of claim presentment: allegations of a "pattern of conduct that would *necessarily* have led to the submission of false claims." *Nicholson*, 42 F.4th at 194 (emphasis in original). Of import, the FCA "'was not designed to punish every type of fraud committed upon the government.'" *Nathan,* 707 F.3d at 456 (quoting *Harrison,* 176 F.3d at 785). For a relator pursing the second avenue, allegations of a defendant's actions that "*could* have led, but *need not necessarily* have led, to the submission of false claims" are not sufficient. *Nathan*, 707 F.3d at 457 (emphasis in original). "General allegations . . . that unidentified Medicare [or Medicaid]" fraudulent claims were submitted "do not identify with particularity any claims that would trigger liability under the Act." *Id.* at 460. Indeed, allegations "that some claims must have been presented to the government for payment, because [claims] of this kind frequently and routinely are obtained by persons who participate in health care programs sponsored by the federal government," do not suffice. *Id.* at 461.

Rather, "Rule 9(b) requires that 'some indicia of reliability' must be provided in the complaint to support the allegation that an actual false claim was presented to the government." *Id.* at 457. As the Fourth Circuit recently reiterated, even when a plaintiff provides the court with the "who, the what, the where, and the when" of a particular action, the plaintiff must still plead

with particularity the "'how'– indeed, *whether*–any claim was fraudulent.[]" *Kyer,* 178 F.4th at 129-30 (emphasis in original).

In this Circuit, the cases reflect a patchwork of conclusions as to whether a relator has alleged a "pattern of conduct that would *necessarily* have led to the submission of false claims." *Nicholson*, 42 F.4th at 194 (emphasis in original). Although the inquiry is simply stated, the application of the standard seems to vary.

In *Kyer,* 178 F.4th at 125, the plaintiff, a former hospital nurse, alleged that five defendants in the hospital's "corporate family" violated the Act "by submitting claims barred by the Stark Law and the Anti-Kickback Statute." The plaintiff provided the court with "roughly 30 pages of tables attached to the complaint" that "correspond[ed] to a billed procedure, identified by a five-digit code." *Id.* at 129. The Fourth Circuit observed that plaintiff had shown that defendants "submitted a claim to the federal government for a service that occurred at a [defendant] hospital." *Id.* And, the plaintiff "adequately allege[d]" that defendants submitted "annual cost reports that certify 'that the services identified in this cost report were provided in compliance with' both the Stark Law and the Anti-Kickback Statute." *Id.* at 130. However, the Fourth Circuit said: "[T]he face of the submitted-claims tables and certification do not establish how or whether the claims were fraudulent. So the complaint must either allege *how* the claims in the appendices or cost reports were fraudulent, or show that the defendants' pattern of conduct—that is, the alleged prohibited kickback or Stark Law violation—necessarily resulted in the submission of false claims." *Id.* (emphasis in original).

The Court concluded that the plaintiff did not plausibly allege a Stark Law violation, *id.*, or an Anti-Kickback Statute violation. *Id.* at 135. It explained: "After bringing each allegation into focus, any fraud that the complaint conjures appears only in the corner of the eye—a mirage

that dissipates when viewed directly." *Id.* at 139. Because the plaintiff "failed to allege fraud with the kind of particularity that Rule 9(b) requires," the Court affirmed dismissal of the suit. *Id.*

*Wheeler*, 127 F.4th 472, is also instructive. There, the relator's former employer, the defendant, contracted "with the government under Medicare, Medicaid, and other government-funded healthcare programs to render methadone-assisted treatment to patients suffering from opioid use disorder." *Id.* at 479. "The payment plans for these addiction treatment programs required [defendant] to provide patients therapy and counseling, in addition to methadone treatment." *Id.* Plaintiff claimed that defendant "was not providing the requisite therapy and counseling." *Id.* Rather, defendant was "falsifying medical records–fabricating fake therapy notes . . . and relying in part on these falsified records to submit claims to the government for payment." *Id.*

Defendant argued, *inter alia*, that plaintiff failed to allege submission of false claims with the requisite particularity required under the Rule 9(b). *Id.* at 491. According to defendant, relator "failed to allege that the fraudulent therapy notes were submitted in actual claims for payment." *Id.* at 493. But, the Fourth Circuit disagreed, finding plaintiff's "allegations meet Rule 9(b)'s standard for submission of false claims." *Id.*

Of import here, the Fourth Circuit concluded that "[t]here can be little doubt that, if [defendant] created these false notes, it billed for those services." *Id.* The Court noted that defendant "contracted directly with the government and sought reimbursement directly from government healthcare programs, which [relator] explained in depth." *Id.* It reasoned that it would "'stretch the imagination'" to create such false records but then alter the regular billing process, creating fictitious therapy sessions that were recorded but never billed. *Id.* (quoting *Nathan,* 707 F.3d at 454, in turn quoting *Grubbs*, 565 F.3d at 192).

In *Nathan*, 707 F.3d at 456, 461, the Fourth Circuit affirmed dismissal of an FCA claim for failure to show submission of a false claim. The Court reiterated that when a "defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." *Id.* at 457 (emphasis in *Nathan*). In reaching its conclusion, the Court was mindful of "the practical challenges that a relator may face . . . in which a relator may not have independent access to records such as . . . invoices. . . ." *Id.* at 458. Nevertheless, the Court said that the "pleading requirements do not permit a relator to bring an action without pleading facts that support all the elements of a claim." *Id.*

Both *Wheeler*, 127 F.4th at 492–93, and *Nathan*, 707 F.3d at 457, cite *Grubbs*, 565 F.3d 180, a Fifth Circuit case. In *Wheeler*, the Court stated that the reasoning of *Grubbs* "proves applicable . . . ." *Wheeler*, 127 F.4th at 492.

The relator in *Grubbs* alleged that two high-ranking hospital employees were billing for services not performed, by delegating patient interactions to nurses, while billing every day as a "face-to-face" patient visit that had not actually occurred. *Grubbs*, 565 F.3d at 184. Although the relator did not specifically allege the "exact dollar amounts, billing numbers, or dates" of any false claims, the Fifth Circuit determined that the relator's allegations were sufficient to state an FCA claim. *Id.* at 189–90.

The court observed that the relator had pled "the existence of a billing scheme" and offered "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. It "reasoned that, because the Complaint included allegations of specific services recorded but never provided, such allegations

constituted 'more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government.'" *Wheeler*, 127 F.4th at 492 (quoting *Grubbs*, 565 F.3d at 192).

*Taylor*, 39 F.4th 177, also provides guidance.  Taylor brought suit under the FCA "against two doctors, five medical companies, and an accounting firm", alleging that defendants had "(1) knowingly submitted false claims to Medicare . . . and (2) engaged in a fraudulent medical upcoding scheme." *Id.* at 183.  Of relevance here, Taylor had been a patient at the defendants' emergency room. *Id.*  She alleged that defendants upcoded "for an unspecified number of patients, including herself." *Id.* at 195.

With regard to Taylor's claims stemming from the medical care she personally received, the Fourth Circuit said that there was "no doubt" that she had adequately pled presentment. *Id.* at 197.  But, as to Taylor's allegations of upcoding for other patients, the Fourth Circuit concluded that Taylor did not adequately plead presentment. *Id*. at 195.  Taylor did not satisfy the first avenue of presentment because she did not allege any "facts about other patients and false invoices at all[.]" *Id.* at 196.  Accordingly, the Fourth Circuit considered whether Taylor alleged a pattern of conduct that would necessarily have led to the submission of false claims to the government for payment. *Id.*  Taylor, like relator in this case, alleged that defendants directed physicians to upcode. *Id.*  However, of import here, the Fourth Circuit stated that "an allegation that the company *directed* doctors to sign something for a fraudulent purpose is not the same thing as an allegation that false claims were actually *submitted*." *Id.* (emphasis in original).

The Fourth Circuit rejected as "'inherently speculative'" and insufficient under Rule 9(b) the Relator's contention that it "'is impossible to believe that other [fraudulent] billings were not made [and submitted to the Government] . . . in the upcoding scheme.'" *Taylor*, 39 F.4th at 196

(quoting first *Nathan*, 707 3d at 461, then quoting Relator's Opening Brief). Accordingly, the Court concluded that Taylor had "failed to 'connect the dots' between [defendant's] direction and the eventual 'government payment.'" *Id.* (quoting *Grant,* 912 F.3d at 197).

*Bharti,* 2023 WL 6441941, is also instructive. In that case, the relator alleged that defendants "conspired to bill for medical services and treatment not performed; to bill for medical services and treatment at a higher, more sophisticated and more time-intensive level than was performed; and to bill for medical services performed but not necessary and effective." *Id.* at *2. For example, the relator alleged that one of the defendant physicians "encouraged" other defendant physicians "to diagnose with sepsis any patient presenting with a slight infection, fever, or mild dehydration because the associated treatment had higher paying billing codes." *Id.* at *4. The relator "reviewed medical charts to ensure compliance with submissions to patients' insurances payors and rounded with physicians to observe their interactions with and physical assessments of their patients." *Id.* at *2. In this role, the relator alleged that she had personally observed the physicians engaging in and discussing their scheme to defraud the Medicare and Medicaid programs. *Id.*

The district court in the Northern District of West Virginia considered "whether Relator adequately pleaded presentment of false claims to the United States government." *Id.* at *7. Analogizing to *Taylor,* 39 F.4th 177, the district court found that the "Relator's FCA claims suffer from the same defect" as those of Taylor. *Bharti,* 2023 WL 6441941, at *9; *see id.* at *8–9. The court observed that although plaintiff "adequately describe[d] the methods used by the Physician Defendants to carry out their fraudulent scheme based on her observations of their conduct as a fellow . . . employee", she failed "to show . . . that any of the allegedly false claims were necessarily presented to Medicare or Medicaid for reimbursement." *Id.* at *9. The court said:

"Merely alleging fraudulent conduct is insufficient." *Id.* Rather, relator's complaint left open the possibility that the government was not billed for and never paid for the fraudulent services or that the fraudulent services were remedied before the government paid. *Id.*

In the district court's view, "[t]hese possibilities" were "fatal" to relator's claims. *Id.* It emphasized: "Rule 9(b) 'does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments *must* have been submitted, were *likely* submitted or *should* have been submitted to the Government.'" *Id.* at *10 (quoting *Taylor,* 39 F.4th at 196) (emphasis in *Taylor*). Accordingly, the district court concluded that the relator had failed to "set out an FCA claim with the requisite particularity," and it dismissed the complaint as to those defendants.

*U.S. ex rel. Hagood v. Riverside Healthcare Ass'n, Inc.*, MSD-11-109, 2015 WL 1349982 (E.D. Va. Mar. 23, 2015), is also informative. There, the relators alleged that the defendants, various medical providers and health companies, submitted false claims in violation of the FCA and other statutes. *Id.* at *1. In particular, the relators claimed that the defendants "'upcoded' services" for over 100 "specific excessive charges[.]" *Id.* The court observed that the "Relators have alleged both the manner in which Defendants automatically overcharged for procedures . . . and specific instances of such conduct." *Id.* at *14. In evaluating the sufficiency of the allegations, the district court considered "whether Relators have pleaded with particularity the presentment of any false claims based on double and triple charges for" various medical services. *Id.* The court concluded that the relators' "allegations fall short of the heightened pleading standard of Rule 9(b)." *Id.*

The district court reasoned: "Relators have failed to plead facts from which the Court can plausibly infer that Defendants actually presented to Government Payors false claims for" various

medical services. *Id.* at \*15. The court emphasized that "neither the automaticity of the mechanism by which Defendants allegedly overcharged for" these services "nor the specific instances of fraudulent charges . . . allow the Court to reasonably infer that Defendants submitted any false claims to Government Payors." *Id.* And, "combining such independently-insufficient allegations does not cure their deficiencies." *Id.*

As I review the second avenue of presentment, I am mindful that it is not a second-class approach. It is a valid method to plead the element.

Relator has set forth detailed allegations, recounting that "Defendants implemented" an upcoding scheme "at the direction of Defendant Graw," which was "designed to defraud Medicare, Medicaid and private insurers[.]" ECF 1, ¶ 59. He maintains that, pursuant to the scheme, defendants billed "85% of patient visits both at Defendants' urgent care and pediatric facilities at Level 4 or higher[.]" *Id.* Elsewhere in the Complaint, Relator asserts that the scheme has "been in place for years to bill all patient visits at Level 4 or higher." *Id.* ¶ 68. Moreover, plaintiff alleges that Dr. Graw "instructed billing personnel to change the CPT codes entered by physicians to higher level codes before billing Medicare, Medicaid or certain private insurers." *Id.* ¶ 60. Relator also describes Dr. Graw as repeatedly directing and pressuring physicians to upcode routine visits to Level 4 or Level 5. *Id.* ¶ 61. Further, Relator alleges that in January 2014, Dr. Graw lied to physicians, falsely claiming that the "auto-code function was 'broken'" so that providers could continue to manually inflate codes. *Id.* ¶ 65.

According to Relator, Right Time achieved "a billing rate of 85%+ of patient visits at Level 4 or Level 5", which he claims "was extraordinarily high," as compared with national averages for urgent care facilities. *Id.* ¶ 64. Relator has also submitted the SHR Audit, showing that the codes used by defendants were inaccurate. The SHR Audit found: "'Seven of the nine encounters

reviewed [in the Audit] (78%) contained documentation that *did not support* the level of service coded.'"  ECF 102-2 at 3 (emphasis in original).  Similarly, plaintiff's allegation that DHMH sent "periodic 'audit letters'" to defendants "regarding higher than average coding levels for specific providers" indicates that defendants' coding was problematic.  *See* ECF 1, ¶ 67; *see also* ECF 102-3 (DHMH Letter).

Plaintiff maintains that the presentation of upcoded invoices to the government is "arithmetically compelled" by his allegations.  ECF 102 at 12.  As noted, he alleges that 15% of Right Time's patients are Medicare patients; 15% are Medicaid patients; and 30% of the Pediatric Group's patients use Medicaid.  ECF 1, ¶¶ 49–51.  And, plaintiff claims that defendants "bill tens of thousands of pediatric patient visits to Medicaid each year, and *a substantial percentage of these visits are 'upcoded.'*"  *Id.* ¶ 68 (emphasis added).

Relator has clearly alleged a scheme to defraud and fraudulent conduct.  Of course, allegations as to the fraudulent scheme are not enough to state a claim under the Act.  But, Relator pairs the fraud allegations with claims that defendants bill a total of approximately 60,000 urgent care patients annually to both Medicare and Medicaid, accounting for approximately 30% of defendants' total patient visits.  *Id.* ¶¶ 67, 68.  And, he alleges that Dr. Graw "draws over $3,000,000 annually," a sum that he characterizes as "excessive for a pediatric and urgent care practice of this size . . . ."  *Id.* ¶ 70.  By inference, that money would have come from the payment of invoices and, by inference, payments made by insurers, including Medicare and/or Medicaid.

Relator has done more than allege a scheme of deliberate and widespread overcharging for various medical services.  He has connected the overcharging to the submission of bills to the government that contain inflated charges.  Indeed, it is implausible that none of the bills was submitted to and paid by government payors.  Moreover, as noted, Relator alleges that the $3

million that Dr. Graw draws in salary is out of line with other medical practices of the same size. This supports the plausible inference that the invoices were necessarily submitted and paid. For Dr. Graw to obtain that size income, the government necessarily must have paid at least some of the invoices.

In *Wheeler*, the Court made clear that "an FCA whistleblower need not 'produce documentation or invoices at the outset of the suit,' nor are they required to have 'specific knowledge of a company's financial and billing structure.'" *Wheeler*, 127 F.4th at 493 (quoting *Grant*, 912 F.3d at 199). Indeed, even if the Relator is unable to include details of a false claim that was actually submitted, the suit "'may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Wheeler*, 127 F.4th at 493 (quoting *Grubbs*, 565 F.3d at 190). Here, as in *Wheeler*, plaintiff "adequately connects the dots." *Wheeler*, 127 F.4th at 493. There is ample indicia here that claims were submitted to the government for payment.

The contention of defendants as to failure to plead presentment is not frivolous. Nevertheless, I am satisfied that Relator has cleared the Rule 9(b) hurdle.[21]

---

[21] To the extent Relator seeks to invoke a relaxed pleading standard because his allegations stem from personal knowledge, *see* ECF 102 at 13–14, this Court, like the district court in *Hagood*, 2015 WL 1349982, at *15 n.9, finds "out-of-circuit authority" on the issue "unpersuasive." As the district court explained, "in *Nathan,* the relator, as one of the defendant's sales managers, likely had detailed knowledge of the fraudulent scheme allegedly perpetrated by the defendant, yet, the Fourth Circuit concluded that his allegations failed under Rule 9(b). Moreover, in [*U.S. ex rel. Rector v. Bon Secours Richmond Health Corp.*]*,* another court within this District found that a relator could not cure his failure to plausibly allege that the defendants actually submitted false claims to the Government 'by asserting any firsthand knowledge of the billing processes of any [defendant].' [JRS-11-38,] 2014 WL 1493568, at *8 [E.D. Va. Apr. 14, 2014] (citing *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1358–59 (11th Cir. 2006)."

Accordingly, the fact that Relator's allegations derive from first-hand knowledge does not carry the day. Relator's reliance on *Wilson,* 525 F.3d 370, appears misplaced. *See* ECF 102 at 13 (quoting *Wilson*, 525 F.3d at 379–80); ECF 103 at 8. *Wilson,* 525 F.3d at 379–80, does not state

To be sure, Relator has not given the Court a specific example of a false claim submitted to the government. But, he has provided specific allegations of the defendants' fraudulent conduct, which necessarily leads to the plausible inference that false claims were presented for payment to the government. Taking Relator's allegations as true, as I must at this juncture, "[t]here can be little doubt that, if [defendants]" implemented this scheme to upcode all routine visits, as alleged, that defendants would bill the government "for those services." *Wheeler*, 127 F.4th at 493. Indeed, "[i]t would 'stretch the imagination' for [defendants'] practitioners continually to" upcode services "but 'to deviate from the regular billing track at the last moment so that the'" upcoded "'services never get billed'" to the government. *Id.* (citations omitted); *see Josephs*, 2025 WL 3223772, at *10.

Accordingly, I conclude that plaintiff has met Rule 9(b)'s pleading standard with regard to presentment.

### B. Dismissal as to Individual Defendants

Defendants contend that the Complaint "does not plead an FCA claim against Defendants Stanford Coleman, Jr., Marc Weber, Jon Gonella, or Kimberly Bresnahan with the particularity required by Rule 9(b)." ECF 99-1 at 8. They assert: "[T]he allegations focus primarily on a limited subset of actors, while attempting to sweep in the remaining defendants through vague, collective assertions such as 'defendants implemented this scheme.'" *Id.* (quoting ECF 1, ¶ 59). According

---

that courts apply "'some flexibility'" to the pleading requirements when a relator's allegations stem from personal knowledge, as Relator claims.

Indeed, Relator's quotation is inaccurate. *See* ECF 102 at 13. In particular, plaintiff stated: "As noted above, 'some flexibility' is applied to the Rule 9(b) analysis where the relator demonstrates personal, first-hand knowledge of the fraudulent scheme." ECF 102 at 13 (quoting *Wilson,* 525 F.3d at 379–80). But, *Wilson* states, 525 F.3d at 379–80: "This does not meet the minimum standards established by Rule 9(b)." Indeed, the words "some flexibility" do not appear in the *Wilson* opinion.

to defendants, "[s]uch conclusory group pleading is insufficient under Rule 9(b), which requires that each defendant's role in the alleged fraud be pleaded with particularity." ECF 99-1 at 8. Defendants claim: "The Complaint's failure to differentiate among defendants is therefore itself a basis for dismissal." *Id.* at 9. Defendants also claim the complaint "does not identify . . . any false claim that these defendants knowingly presented or caused to be presented." ECF 103 at 10.

Regarding Bresnahan, defendants claim that "the Complaint alleges only a single act: that she, along with another defendant, 'frequently instructed' the Director of Billing that 'everything' should be billed at Level 4." ECF 99-1 at 9 (quoting ECF 1, ¶ 60). According to defendants, "[t]hat allegation standing alone, does not plead that Bresnahan presented–or caused to be presented–any false claim for government payment." ECF 99-1 at 9; *see* ECF 103 at 10. And, defendant notes that elsewhere in the Complaint, Relator "alleges that treating physicians–not billing personnel–are responsible for coding." ECF 99-1 at 9 (citing ECF 1, ¶¶ 29, 61, 65). Defendants reason that, by "Relator's own account . . . Bresnahan's alleged comments about billing levels do not plausibly establish causation of any false claim–much less with Rule 9(b) particularity." ECF 99-1 at 9.

With respect to Coleman, Weber, and Gonella, defendants contend that the "Complaint alleges only that another individual urged them to increase billing levels and then asserts, in conclusory fashion, that the medical directors 'did routinely pressure' physicians to upcode." *Id.* (citing ECF 1, ¶ 61). According to defendants, "[t]his unsupported assertion–untethered to any specific statements, dates, claims, or payments–falls far short of pleading the elements of an FCA claim with particularity. A single conclusory sentence in a 19-page complaint cannot satisfy Rule 9(b) or the four-part *Harrison* test." ECF 99-1 at 9; *see* ECF 103 at 10.

- 47 -

Further, defendants assert that "respondeat superior cannot cure a Rule 9(b) deficiency." ECF 103 at 10. According to defendants, "the pleading question at this stage is whether the Complaint alleges with particularity how each individual defendant knowingly presented or caused the presentment of a false claim to the government." *Id.* at 10–11. Defendants claim: "Allowing vicarious liability to supply the missing particularity would effectively erode Rule 9(b)'s defendant-specific pleading requirement whenever a relator sues corporate actors and their agents." *Id.* at 11. And, according to defendants, "at least one court in this District has declined to apply the doctrine of respondeat superior to FCA Claims." *Id.* (citing *United States v. S. Md. Home Health Servs.,* 95 F. Supp. 2d 465, 468–69 (D. Md. 2000)).

Plaintiff counters that the Complaint's allegations against Bresnahan, Coleman, Weber, and Gonella are sufficient. ECF 102 at 14–16. As to Bresnahan, Relator notes that the Complaint alleges that Bresnahan was the COO of Right Time, the Pediatric Group, and Ancillary. *Id.* at 14. According to Relator, in this capacity, Bresnahan "'frequently instructed' Lynn Thomas, the Director of Billing, that 'everything' should be billed at Level 4." *Id.* (quoting ECF 1, ¶ 60). Further, plaintiff claims that this assertion is "reflected in Bresnahan being the only person other than Graw to receive the internal transmission of the SHR Report, [ECF 102-2], reflecting her critical role in developing billing practices." ECF 102 at 14.

Relator avers: "The COO of an enterprise who repeatedly directs the Director of Billing to code all patient visits at Level 4–knowing that Level 4 is reserved for visits of moderate-to-high complexity and that the vast majority of urgent care visits are routine–knowingly causes the submission of false claims within the meaning of 31 U.S.C. § 3729(a)(1)(A)." *Id.* at 14–15. Moreover, plaintiff argues: "Defendants' characterization of [Bresnahan's alleged activity] as a

- 48 -

'single isolated act' misreads the Complaint.  The word 'frequently' conveys a pattern of recurring conduct, not an isolated event."  *Id.* at 15 (alterations added).

In the Complaint, plaintiff makes the following allegation regarding Coleman, Weber, and Gonella, ECF 1, ¶ 61:

> At weekly meetings of Right Time's medical directors and other senior staff, held on Tuesday mornings, Dr. Graw would review the recent figures, on a weekly basis, as to average level of billing code per visit. Dr. Graw would frequently instruct the medical directors (the members of the MRC, Defendants Coleman, Weber and Gonella) to "get the billing levels up to Level 4 or higher".  The medical directors had the primary responsibility to put pressure on physicians in Defendants' employ, and did routinely pressure those physicians, to "upcode" routine visits to Level 4 or Level 5 in order to achieve the coding targets established by Dr. Graw.

Hayden contends that this allegation constitutes "a specific description of an organizational chain of command through which false claims were generated and submitted."  ECF 102 at 16. He asserts that, "[a]s medical directors" of Right Time, these defendants "occupied the critical transmission point between Dr. Graw's directives and the treating physicians who entered CPT codes: They were the institutional mechanism through whom the upcoding mandate was communicated and enforced downward."  *Id.* at 15 (citing ECF 1, ¶ 61).  Plaintiff avers that his allegation against Coleman, Weber, and Gonella "is grounded in the specific context of weekly Tuesday morning meetings at which Dr. Graw reviewed billing statistics and issued upcoding directives to the medical directors, who then transmitted and enforced those directives upon treating physicians."  ECF 102 at 15.

In addition, Relator posits: "The allegation specifies who (Coleman, Weber, Gonella), what (routine pressure on physicians to upcode to Level 4 or 5), in what context (following weekly billing review meetings with Dr. Graw), and to what end (achieving Dr. Graw's established coding targets)."  *Id.*  According to Relator, "[t]hat is sufficient particularity under Rule 9(b)."  *Id.* at 16

(citing *U.S. ex rel. Brunson v. Narrows Health & Wellness, LLC*, 469 F. Supp. 2d 1048, 1052 (N.D. Ala. 2006)).

Alternatively, plaintiff claims that all individual defendants are liable under a theory of respondeat superior. ECF 102 at 16. Relator claims: "Individual Defendants are all officers of one or more of the Entity Defendants, and the Entity Defendants are liable for the conduct of the Individual Defendants under the doctrine of respondeat superior." *Id.* (citing ECF 1, ¶ 80). According to Relator, "[t]his provides a separate and independent basis for FCA liability as to each individual defendant that Defendants' motion does not meaningfully address." ECF 102 at 16.[22]

"The FCA's provisions 'indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud.'" *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 191 (D. Md. 2019) (quoting *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 126 (D.D.C. 2017)). And, "when a relator raises allegations of fraud against multiple defendants, the complaint must apprise each defendant of the specific nature of his or her participation in the fraud." *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526 (D. Md. 2006) (internal quotation marks and citation omitted), *aff'd in part, dismissed in part,* 237 F. App'x 802 (4th Cir. 2007) (per curiam). Indeed, a relator's allegations as to another individual defendant does not constitute impermissible group pleading when the defendant's "knowing participation was essential to the fraud and resulted in the Government overpaying[.]" *Fadlalla*, 402 F. Supp. 3d at 192.

In the context of claims subject to the heightened pleading standard under Fed. R. Civ. P. 9(b), "group pleading is allowable where it is 'plausible that each defendant was involved in all of

---

[22] Because the Court has determined that plaintiff's allegations as to the conduct of Bresnahan, Weber, Gonella, and Coleman are sufficient to survival dismissal, the Court need not resolve the parties' dispute concerning the applicability of respondeat superior.

the facts as alleged.'"  *Bell v. APEX Realty, LLC*, ABA-24-0157, 2025 WL 2772026, at *6 (D. Md. Sept. 29, 2025) (quoting *McPherson v. Baltimore Police Dep't*, 494 F. Supp. 3d 269, 280 (D. Md. 2020)), *order granting reconsideration on other grounds,* ABA-24-0157, 2025 WL 3469639 (D. Md. Dec. 3, 2025).  Allegations that defendants "worked in concert" clear that bar.  *Bell*, 2025 WL 2772026, at *6.

As to Bresnahan, plaintiff alleges that "Bresnahan frequently instructed Ms. Lynn Thomas, the Director of Billing, that 'everything' should be billed at Level 4."  ECF 1, ¶ 60.  And, plaintiff claims that Bresnahan received a copy of the SHR Audit, which noted issues with defendants' coding.  *Id.* ¶ 70.  As to Coleman, Weber, and Gonella, Relator asserts that these individuals "routinely pressure[d] . . . physicians, to 'upcode' routine visits to Level 4 or Level 5 in order to achieve the coding targets established by Dr. Graw."  *Id.* ¶ 61.  The allegations support the plausible inference that these defendants knew that the invoices were inflated and false and were submitted to various insurers.

Although plaintiff's allegations as to the conduct of these defendants is not fulsome, Relator asserts that these defendants "directed" other employees to falsely upcode procedures, thereby "instruct[ing] others to incorrectly" provide false claims to the government.  *See Elliott*, 2026 WL 1046672, at *18 (rejecting defendant's contention that some of relator's counts merited dismissal "for impermissible group pleading").  The allegations are sufficiently specific to "apprise" each defendant "of the specific nature of his or her participation in the fraud."  *See Brooks*, 423 F. Supp. 2d at 526.  Accordingly, Relator's allegations as to Bresnahan, Weber, Gonella, and Coleman meet the pleading requirements under Fed. R. Civ. P. 9(b) and the FCA.

### V.      Conclusion

For the foregoing reasons, I shall deny defendants' Motion.  An Order follows, consistent with this Memorandum Opinion.


Date: July 20, 2026                                         /s/
                                          Ellen Lipton Hollander
                                          United States District Judge